JOURNAL ENTRY AND OPINION *Page 4 
{¶ 1} Defendants-appellants, North Olmsted City Schools Board of Education ("the School Board"), North Olmsted High School ("the High School"), and Kenneth Vlasak ("Vlasak") (collectively referred to as "appellants"), appeal the trial court's denial of their motion for summary judgment seeking dismissal of plaintiffs-appellees claims pursuant to the immunity under R.C. Chapter 2744. An order that denies a political subdivision immunity under R.C. Chapter 2744 is a final, appealable order. R.C. 2744.02(C); Hubbell v. Xenia, 115 Ohio St.3d 77,2007-Ohio-4839, syllabus. Accordingly, the denial of summary judgment on any claims, issues, or arguments beyond political subdivision immunity are not final and will not be addressed.[1] For the reasons that follow, we affirm the decision of the trial court.
 {¶ 2} Martin A. Bolling ("Martin"), a minor, and Kristin Bolling ("Kristin"), individually and in her capacity as Martin's mother, (collectively referred to as "appellees"), filed claims against the appellants and other John Doe defendants alleging that they negligently, recklessly, willfully, and wantonly caused Martin to suffer injuries to his hand while operating a machine during his high school shop class.
 {¶ 3} Martin sustained multiple amputations to the fingers on his dominant hand while operating a jointer machine on October 27, 2004. The jointer machine had a cutter head, which contained three knives. Vlasak, an industrial arts teacher *Page 5 
in the machine shop of the high school, confirmed that there was a guard attached to the jointer machine that "would swing out of the way as the wood was coming through. And then after the wood went through, the guard was intended to swing back and cover the cutting knives." Vlasak believed the machine was purchased in 1964. He believed that the jointer machine had been broken and repaired, including a part of the bracket that held the pivot point. Vlasak stated "the arm was repaired and the guard was functioning properly after the repairs." According to Vlasak, in the 30 years that the jointer machine was in use in his classroom, the only maintenance it required was to change the blades and "one adjustment on the guard which controlled the tension of the spring, which aided closing * * * other than that * * * there was nothing ever really wrong with the machine."
 {¶ 4} Vlasek stated that Martin took a jointer test three times and passed it prior to being allowed to use the jointer machine. Vlasak also demonstrated the use of the jointer machine to the class. He instructed the students on safety and that machines are to be used with guards in place. Vlasak instructed the students to avoid knots in the wood and he also precut the wood pieces for the students.
 {¶ 5} The first time Martin used the jointer machine was the day he was injured. Vlasak precut Martin some wood pieces. Martin waited as another student operated the jointer machine. Martin watched the student operate the machine. Then, Vlasak watched Martin go through the jointing operation the first two or three times. Vlasak said Martin appeared to be performing the operation competently and *Page 6 
safely. The machine was also operating safely. Vlasak said that if he would have seen Martin doing something incorrectly he would have immediately said something to him "without a doubt." Vlasak turned his back to address other students and then heard Martin scream.
 {¶ 6} A student witness reported that he thought Martin had his hand too low or too close to the blade. Another student reported seeing Martin holding his hand and said his hand slipped. A third witness reported that he saw Martin using the jointer machine without a push stick which "enabled the accident." Vlasak confirmed that he did not really know how Martin's accident happened. Likewise, Martin testified that he did not know how the accident happened. According to Martin, one of his boards "got caught or something and got pushed out from under [his] hands. * * * [His] hand got caught in the blade and [he] instantly took it out[.]" Martin said he was "freaking out," that he did not give an explanation as to what happened because he "didn't really know at the time," he was "so distraught."
 {¶ 7} Vlasak immediately tended to Martin by wrapping his hand and applying pressure. He escorted Martin to the front of the school and stayed with him until the ambulance arrived. Vlasak was so upset by the accident he took a week off and sought counseling.
 {¶ 8} After Martin's accident, an incident report was made that indicated, "Marty was face jointing his boards for his project. * * * the student placed his fingers into the revolving cutter head of the jointer." After the accident, the machine was no *Page 7 
longer used. To Vlasak's knowledge, the machine was not changed, altered, or modified since the accident. It was moved to a storage garage on the school property. The principal instructed that no one was to touch the machine. When appellees inspected the machine post-accident, the guard on it was open and would not close.
 {¶ 9} The presence of the guard on the jointer machine did not prevent Martin's injuries. Vlasak testified that there were two instances where the guard would remain open: (1) a loose tension screw and (2) insufficient waxing on the work surface. Vlasak testified that sometimes he had to adjust the spring tension on the jointer machine to help it close.
 {¶ 10} Vlasak said he checked the screw and tightened the spring on a weekly basis. The vibration causes the screw to back out of the nut and it loses its tension. That could cause the guard to close more slowly or not at all. As the screw loosens, the guard will start to close more slowly. If the guard stays open, the screw is too loose. To get to that point, Vlasak stated it would probably take five years. It would take about a year before the guard would start sticking. To get that way, it would have to go unmaintained. The jointer machine also required waxing on the surfaces, which was sometimes performed by more advanced students. Vlasak said the jointer was waxed about once a week.
 {¶ 11} Appellees maintained that appellants were not entitled to political subdivision immunity. The trial court denied appellants' motion for summary *Page 8 
judgment wherein they had asserted political subdivision immunity. Appellants now appeal, raising a sole assignment of error, which states:
 {¶ 12} "I. Whether the trial court erred in denying defendants-appellants' motion for summary judgment."
 {¶ 13} "A court of appeals must exercise jurisdiction over an appeal of a trial court's decision overruling a Civ. R. 56(C) motion for summary judgment in which a political subdivision or its employee seeks immunity." Hubbell, 115 Ohio St.3d 77, 2007-Ohio-4839, ¶ 21. We review a summary judgment decision de novo and must construe the facts in a light most favorable to the non-moving party, which, in this case, would be the appellees. Civ. R. 56.
 {¶ 14} The three-tier analysis that governs the application of sovereign immunity to a political subdivision pursuant to Chapter 2744
of the Ohio Revised Code, is set forth in Cramer v. Auglaize Acres,113 Ohio St.3d 266, 2007-Ohio-1946, ¶ 14-16, quoting Colbert v.Cleveland, 99 Ohio St.3d 215, 2003-Ohio-3319, ¶ 7-9:
 {¶ 15} "Determining whether a political subdivision is immune from tort liability pursuant to R.C. Chapter 2744 involves a three-tiered analysis. The first tier is the general rule that a political subdivision is immune from liability incurred in performing either a governmental function or proprietary function. R.C. 2744.02(A)(1). However, that immunity is not absolute. R.C. 2744.02(B) * * *. *Page 9 
 {¶ 16} "The second tier of the analysis requires a court to determine whether any of the five exceptions to immunity listed in R.C. 2744.02(B) apply to expose the political subdivision to liability. * * *
 {¶ 17} "If any of the exceptions to immunity in R.C. 2744.02(B) do apply and no defense in that section protects the political subdivision from liability, then the third tier of the analysis requires a court to determine whether any of the defenses in R.C. 2744.03 apply, thereby providing the political subdivision a defense against liability." (Internal citations omitted.)
 {¶ 18} "For the individual employees of political subdivisions, the analysis of immunity differs. Instead of the three-tiered analysis * * *, R.C. 2744.03(A)(6) states that an employee is immune from liability unless the employee's actions or omissions are manifestly outside the scope of employment or the employee's official responsibilities, the employee's acts or omissions were malicious, in bad faith, or wanton or reckless, or liability is expressly imposed upon the employee by a section of the Revised Code." Cramer v. Auglaize Acres,113 Ohio St.3d 266.
 {¶ 19} The School Board is a political subdivision and Vlasak was employed as an industrial arts teacher in the machine shop of the high school at the time of Martin's injury.
 {¶ 20} The injury occurred during the provision of public education, which is a governmental function. R.C. 2744.01(C)(2)(c). The first tier of the analysis is satisfied. *Page 10 
 {¶ 21} Appellees maintain that the exception to immunity contained in R.C. 2744.02(B)(4)[2] applies, which provides:
 {¶ 22} "(4) * * * political subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of, and is due to physical defects within or on the grounds of, buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code."
 {¶ 23} Martin's injuries occurred on the school grounds in connection with a governmental function (i.e., the provision of a public education). Appellees allege and have produced some evidence that the injuries resulted from a defect on the ground, that being a defect in the jointer machine. Finally, appellees assert that the injuries were caused by the negligence of an employee of the school. There is evidence from which reasonable minds could differ as to whether Vlasak was negligent in the manner he instructed and supervised Martin's use of the power jointer or in the manner he maintained the power jointer. The second tier of the *Page 11 
analysis is satisfied. Accord, Elston v. Howland Local Schools,113 Ohio St.3d 314, 2007-Ohio-2070, ¶ 11.
 {¶ 24} Appellees maintain that an exception to employee immunity exists because, they believe, genuine issues of material fact exist concerning whether Vlasak's acts or omissions were malicious, in bad faith, or wanton or reckless.
 {¶ 25} Appellants assert that R.C. 2744.03(A)(3), (5) and (6) operate to reinstate the School Board and Vlasak's immunity status. Those provisions provide:
 {¶ 26} "(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:
 {¶ 27} "* * *
 {¶ 28} "(3) The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee."
 {¶ 29} "* * *
 {¶ 30} "(5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in *Page 12 
determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.
 {¶ 31} "(6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
 {¶ 32} "(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
 {¶ 33} "(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
 {¶ 34} "(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term `shall' in a provision pertaining to an employee."
 {¶ 35} It does not appear from the record that Martin's injuries arose from any action or inaction by an employee exercising discretion with respect to "policy-making, planning, or enforcement powers by virtue of the duties and *Page 13 
responsibilities of the office or position of the employee." Accordingly, 2744.03(A)(3) does not apply here.
 {¶ 36} Appellees argue that immunity should not be reinstated under the remaining provisions because they contend that genuine issues of material fact exist as to whether Vlasak acted with discretion and did so in a willful, wanton, or reckless manner in the way he supervised Martin and maintained the power jointer.
 {¶ 37} The way in which a teacher supervises his class and maintains the classroom equipment are discretionary acts. Banchich v. Port ClintonPublic School District (1989), 64 Ohio App.3d 376, 378 ("the manner in which [the teacher] instructed and supervised his student's use of the power jointer was a discretionary act. * * * [T]he teacher's maintenance and inspection of the power jointer used in the carpentry class also were a discretionary act.")
 {¶ 38} Therefore, the inquiry focuses upon whether construing the evidence in a light most favorable to appellees there exists a genuine issue of material fact from which reasonable minds could conclude that Vlasak acted with malicious purpose, in bad faith, or in a wanton or reckless manner.
 {¶ 39} We are guided by the Ohio Supreme Court's recent decision inOToole v. Denihan, 118 Ohio St.3d 374, which addressed what constitutes reckless conduct for purposes of statutory political subdivision immunity:
 {¶ 40} "[A]n actor's conduct `is in reckless disregard of the safety of others if he does an act or intentionally fails to do an act which it is his duty to the other to do, *Page 14 
knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.' * * * Distilled to its essense, and in the context of R.C. 2744.03(A)(6)(b), recklessness is a perverse disregard of a known risk." Id. at ¶ 73.
 {¶ 41} "Recklessness, therefore, necessarily requires something more than mere negligence. * * * In fact, `the actor must be conscious that his conduct will in all probability result in injury.'" Id. at ¶ 74; see, also, Rankin v. Cuyahoga County Dep't of Children Family Servs.,118 Ohio St.3d 392, 2008-Ohio-2567, ¶ 37. Unless the individual's conduct does not demonstrate a disposition to perversity as a matter of law, the determination of recklessness is within the province of the jury.OToole, 2008-Ohio-2574, ¶ 75.
 {¶ 42} "`Wanton conduct' involves failure to exercise any care whatsoever toward those to whom he owes a duty of care, and his failure occurs under circumstances in which there is great probability that harm will result." Gladon v. Greater Cleveland Regional TransitAuthority (1996), 75 Ohio St.3d 312, 1996-Ohio-137. The term "implies intent relating to misconduct rather than relating to result, so that intent to injure need not be shown." Brockman v. Bell (1992),78 Ohio App.3d 508, 605 N.E.2d 445. *Page 15 
 {¶ 43} "In contrast, `willful misconduct' involves a more positive mental state prompting the injurious act than wanton misconduct, but the intention relates to the misconduct, not the result. Id. Consequently, `willful misconduct' is defined as: `an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing some wrongful acts with knowledge or appreciation of the likelihood of resulting injury.'" Fogle v. Vill. of Bentleyville, Cuyahoga App. No. 88375, 2008-Ohio-3660, ¶ 47, quoting Whitfield v. City of Dayton,167 Ohio App.3d 172, 2006-Ohio-2917, quoting Brockman, supra.
 {¶ 44} Appellees contend that fact issues remain as to whether Vlasak acted in a reckless, wanton, or willful manner. Having reviewed the entire record, we conclude that the evidence does not establish that Vlasak acted with malicious purpose, bad faith, or wantonly. However, reasonable minds could reach differing conclusions as to whether his acts or omissions qualified as being reckless.
 {¶ 45} The record evidence indicates that the jointer machine was in use at the school since the 1960's. By the time of Martin's accident in 2004, Vlasak said he was adjusting the machine to enable proper guard operation on a weekly basis. He further testified that it was the vibrations of the machine's use that required the adjustments. Vlasak never reported any trouble with the machine. Vlasak also said it would take five years of non-maintainance for the guard on the machine to remain open, which was the condition appellees found it in upon inspection approximately a *Page 16 
year after the accident. Ultimately, this is a question to be resolved by the jury. Vlasak did testify that if Martin would have operated the machine as instructed, his injury would not have occurred even when the guard failed. Although we do not question Vlasak's sincerity on this point, the fact is that the guard failed causing Martin's fingers to be amputated. Vlasak's acts or omissions concerning the maintenance of the machine could have been reckless in this regard. Accordingly, appellants' sole assignment of error is overruled.
Judgment affirmed.
It is ordered that appellees recover from appellants their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
CHRISTINE T. McMONAGLE, J., and PATRICIA A. BLACKMON, J., CONCUR
[1] At oral argument, appellees conceded that North Olmsted High School is not a proper party and therefore the claims pertaining to them are moot.
[2] The statute was revised effective April 9, 2003. In Alden v.Kovar, 2008-Ohio-4302, ¶ 49, the Ohio Supreme Court noted that "under the revised version of R.C. 2744.02(B)(4), in addition to requiring acts of negligence, the exception to immunity requires that the injury, death, or loss be due to a defect on or within the grounds or buildings of the political subdivision." *Page 1